IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BARTON & ASSOCIATES, INC. AND BARTON HEALTHCARE STAFFING, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> GREG HANLON, JR. <br><br> Defendant. | CIVIL ACTION NO. 1:24-cv-00433-RGA <br><br> JURY TRIAL DEMANDED |

### AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1.     Plaintiffs Barton & Associates, Inc. ("Barton") and Barton Healthcare Staffing ("BHS") (collectively, "Plaintiffs"), by and through their counsel, Greenberg Traurig, LLP, bring this civil action against Barton's former employee, Defendant Greg Hanlon, Jr. ("Hanlon" or "Defendant"), seeking damages and injunctive relief for his actual and threatened breaches of certain contractual obligations and restrictive covenants to which he agreed as a condition of and in connection with his employment with Barton.

2.     Hanlon is currently employed by NurseStar Medical Partners, LLC ("NurseStar"), a direct competitor of BHS whose affiliate, DocStar Medical Partners, LLC ("DocStar"), is a direct competitor of Barton. Collectively, NurseStar and DocStar compete with Barton and BHS, and on information and belief, Hanlon has been aiding, assisting, and abetting NurseStar and DocStar to directly and indirectly compete with Barton and BHS. Hanlon's employment with NurseStar and relationship with DocStar violate his contractual obligations and restrictive covenants owed to Plaintiffs under two separate, legally binding contracts: A Confidentiality, Restrictive Covenants, and Proprietary Rights Agreement that he entered into with Barton as a condition of employment

1

(the "Barton Agreement")[1]; and an Amended and Restated Agreement of Limited Partnership (the "LP Agreement") to which Hanlon became a party in connection with Plaintiffs' August 2022 acquisition. The Barton Agreement and LP Agreement are attached hereto as **Exhibit A** and **Exhibit B**, respectively.

3. Hanlon's breaches of his contractual obligations and restrictive covenants under the Barton Agreement and LP Agreement have caused Plaintiffs to suffer damages, and Hanlon's continued breaches thereof will cause Plaintiffs to suffer irreparable harm for which money damages will be inadequate.

## THE PARTIES

4. Plaintiff Barton is a Delaware corporation with its principal place of business in the Commonwealth of Massachusetts.

5. Plaintiff BHS is a Delaware limited liability company 100% owned and member-managed by Barton, whose sole stockholder is Crown Buyer, Inc., a Delaware corporation, whose principal place of business is not located in Texas.

6. Plaintiffs are interested parties and third-party beneficiaries of the LP Agreement, and the Limited Partnership has assigned to Plaintiffs all claims against Hanlon under the LP Agreement relating to and arising from his breaches thereof. *See* Assignment of Claims attached hereto as **Exhibit C**.

7. Defendant Hanlon is a citizen of the State of Texas, on information and belief.

---

[1] The Amended Complaint corrects the Barton Agreement attached to the Complaint as Exhibit A. The Barton Agreement alleged herein and now attached was signed by Hanlon on December 2, 2021. *See infra,* ¶26.

2

## JURISDICTION AND VENUE

8. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00.

9. This Court has supplemental subject matter jurisdiction over the claims arising from or relating to the Barton Agreement pursuant to 28 U.S.C. § 1367, as those claims are so related to the claims arising from and relating to the LP Agreement that they comprise part of the same case or controversy.

10. This Court has personal jurisdiction over Hanlon, because he has consented to this Court's personal jurisdiction over him for all disputes arising from or relating to the LP Agreement. *See* Ex. B, § 14.7.

11. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(3), as Hanlon has consented to this Court's personal jurisdiction over him, and waived any right to object on the basis of improper or inconvenient forum or venue, with respect to all disputes arising from or concerning the LP Agreement. *See* Ex. B, § 14.7.

## FACTS

**Barton's Business**

12. Barton is a national *locum tenens*[2] healthcare staffing firm, with 10 offices and more than 700 employees. Barton's business is focused on placing specialized medical professionals such as doctors, dentists, nurse practitioners, and physician assistants ("Providers") in temporary

---

[2] *Locum tenens* is a Latin phrase that means "to hold the place of" and is used in the healthcare staffing industry to describe the business of temporary staffing of physicians and other medical professionals with healthcare facilities.

clinical positions at various hospitals and healthcare facilities across the country with which Barton has contracted for that purpose ("Clients").

13. The two most essential operational functions of Barton's business are recruiting Providers and managing Client accounts. Barton hires Recruiting Consultants and Account Executives to perform these functions who have little to no experience, and Barton develops their knowledge and skills through internal and ongoing training methods and strategies. Barton spends substantial time and expense recruiting and training these employees, who in turn generate substantial goodwill on behalf of Barton.

14. Barton's Recruiting Consultants are responsible for identifying and building relationships with Providers who are interested in serving in *locum tenens* positions. Recruiting Consultants spend a significant amount of time and resources learning Providers' licensure histories, experience, preferences, and availabilities. Barton considers such information to be its proprietary, confidential trade secret information, and maintains it in a confidential manner.

15. Barton's Account Executives are responsible for sourcing, establishing relationships with, and coordinating the placement of Providers with prospective and existing Clients. Account Executives spend a significant amount of time and resources learning each Client's particular preferences and staffing needs, identifying key Client contacts, and negotiating contracts and fees. Barton considers such information to be its proprietary, confidential, trade secret information, and maintains it in a confidential manner.

16. Barton's Recruiting Consultants and Account Executives necessarily work closely with one another to achieve Barton's business objectives.

**BHS's Business**

17. BHS, an affiliate of Barton, is a national healthcare staffing firm that places nurses and allied healthcare professionals in temporary clinical positions at various hospitals and healthcare facilities across the country with which BHS has contracted for that purpose.

18. BHS's business model is essentially the same as Barton's above-described business model for purposes relevant to this action.

19. Barton and BHS work together collaboratively, sharing information, knowledge, and business opportunities. Barton and BHS share Clients and look for opportunities to cross-sell their complementary services to each other's Clients.

**Hanlon's Employment with Barton**

20. Barton employed Hanlon for more than ten years – from September 30, 2013 until December 5, 2023, when Barton was forced to terminate his employment for cause.

21. Barton afforded Hanlon significant advancement opportunities throughout their employment relationship, culminating in his promotion to the position of Director, Sales & Recruiting for the Austin, Texas office, effective January 2022.

22. Hanlon received a significant pay increase with his promotion to Director of the Austin office. His annual base salary was increased to $250,000, and in 2022 he received over $1,000,000 in total compensation.

23. As Director of the Austin office, Hanlon was responsible for managing all of the Austin office's sales and recruiting operations. He had full profit and loss (P&L) responsibility and led a team of approximately sixty-five Recruiting Consultants and Account Executives. His responsibilities included monitoring and facilitating sales and recruiting operations throughout the United States.

24.     As Director of the Austin office, Hanlon reported directly to Barton's senior executive team.  He had high-level access to Barton's and BHS's proprietary, confidential and trade secret information, including their strategic business plans for the entire United States.  He attended senior management strategy meetings in which Plaintiffs' proprietary, confidential and trade secret information, including key Clients and related business opportunities and development goals, was discussed at length and in detail.

25.     Prior to his termination, Hanlon visited the LinkedIn for DocStar and thereafter, he engaged in communication with DocStar and/or NurseStar.  Days before his termination, Hanlon downloaded Barton Earned Incentive Report, which detailed placement and pricing information for staffing nationwide.  And on December 4, 2023, the day before Hanlon's employment with Barton was terminated, Hanlon attended a senior management strategy meeting where key clients, key client opportunities, and competitive development goals were discussed at length and in detail.  During this meeting, Hanlon learned confidential strategy information, including Barton's Five-Year Plan, 2024 sales budget, strategy to increase revenue, and clients to target.  Upon information and belief, it is inevitable that Hanlon is using and disclosing Barton's confidential information in connection with his employment with NurseStar and relationship with DocStar.  Tens of millions of dollars are at risk if Hanlon is allowed to compete with his knowledge of and access to this information.

**Hanlon's Obligations Under the Barton Agreement**

26.     Hanlon signed a restrictive covenant agreement at the inception of his employment with Barton and signed a new one with each promotion or other advancement opportunity.

27.     Hanlon signed the Barton Agreement, which is at issue in this action, on or about December 2, 2021, as a condition of his promotion to Director of Sales and Recruiting for the Austin, Texas office.

28.     The Barton Agreement is expressly designed to protect the legitimate business interests of Barton and its affiliate BHS. *See* Ex. A, Introductory Paragraph ("Employer Group" defined). BHS is an intended beneficiary of the Barton Agreement.

29.     Under the Barton Agreement, Hanlon agreed and covenanted that during and after his employment with Barton, he would: Treat all Confidential Information as strictly confidential; not access, use or disclose any Confidential Information except as required in the performance of his authorized employment duties or with the prior written consent of an authorized officer; and not use or disclose any Confidential Information in any manner detrimental to the Employer Group (which includes Barton and BHS). *See* Ex. A, ¶2(b). "Confidential Information" is defined as "confidential, secret, and proprietary documents, materials, data, and other information, in both tangible and intangible form, of or relating to the Employer, Employer Group [including BHS], Employer's Business, Clients, Providers, vendors, suppliers, investors, and other associated third parties." *Id.* ¶2(a).

30.     Under the Barton Agreement, Hanlon agreed and covenanted to refrain from engaging in "Prohibited Activity" within the United States during the "Restricted Period." *See* Ex. A, ¶3(a). "Prohibited Activity" is defined as "any activity in which you, in any employment, ownership, controlling, joint-venture, agency, or other capacity, directly or indirectly compete with the Employer's Business, or aid, assist, or abet any other Person in directly or indirectly competing with the Employer's Business, in whole or in part." *Id.* ¶1(f). "Restricted Period" is defined as

"during your employment … and one year following termination of such employment…." *Id.* ¶1(h).

31. Under the Barton Agreement, Hanlon agreed and covenanted that, during the Restricted Period, he would "not to directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any person who is an employee of the Employer Group. Ex. A, ¶3(b).

32. Under the Barton Agreement, Hanlon agreed and covenanted that, during the Restricted Period, he would "not to directly or indirectly solicit, contact (including without limitation by email, regular mail, express mail, telephone, text message, fax, instant message, and any form of social media), attempt to contact, accept business from, or meet or engage in any business with any Client or Provider for purposes of offering or accepting goods or services similar to or competitive with those offered by the Employer, including anything that would constitute a Prohibited Activity." Ex. A, ¶3(c).

**Hanlon's Obligations Under the LP Agreement**

33. In or around July 2022, Barton and BHS were acquired by H.I.G. Capital ("HIG"), a leading global alternative investment firm.

34. The Limited Partnership was established in connection with the acquisition, for the purpose of giving certain Barton and BHS employees (among other key stakeholders) the opportunity to acquire equity in, and realize financial gain from the subsequent sale of, the Limited Partnership.

35. Barton and BHS are "Consolidated Entities" under the LP Agreement. *See* Ex. B, § 1.1, p. 4 (Definition of "Consolidated Entities") and p. 7 (Definition of "OpCo"). The LP Agreement defines "Consolidated Entities" to include "OpCo." *Id.* The LP Agreement further

defines OpCo to mean "Barton & Associates, Inc." *Id.* The LP Agreement also defines "Consolidated Entities" to include OpCo's (i.e., Barton's) "direct and indirect current and future Subsidiaries," and BHS is a subsidiary of Barton, as it is 100% owned and member managed by Barton.

36. Hanlon, by virtue of his position as Director of Sales & Recruiting for the Austin office, was offered and accepted, the opportunity to acquire equity in the Limited Partnership.

37. On or about October 7, 2022, Hanlon entered into an Incentive Securities Agreement, whereby he was granted 300,000 Class P Units of the Limited Partnership. The Incentive Securities Agreement is attached hereto as **Exhibit D**.

38. On or about November 4, 2022, Hanlon entered into a Subscription Agreement, whereby he purchased 50,000 Class A-1 Units and 50,000 Class A-2 Units of the Limited Partnership at the purchase price of $50,000.00. The Subscription Agreement is attached hereto as **Exhibit E**.

39. Hanlon executed a Joinder Agreement appurtenant to the Incentive Securities Agreement and another Joinder Agreement appurtenant to the Subscription Agreement, pursuant to each of which he became a Management/Restricted Partner of the Limited Partnership and a party to the LP Agreement. *See* Ex. D (Incentive Securities Agreement Joinder) and Ex. E (Subscription Agreement Joinder).

40. In exchange for receiving equity as a Management/Restricted Partner of the Limited Partnership, Hanlon agreed to, and became bound by, certain restrictive covenants necessary to protect the proprietary, confidential and trade information, business relationships, and goodwill of the Limited Partnership and its Consolidated Entities – including Barton and BHS.

41. Under the LP Agreement, Hanlon agreed to protect, and not improperly use or disclose, the Confidential Information of the Consolidated Entities (including Barton and BHS) and their customers and suppliers during and after his employment with Barton. *See* Ex. B, § 13.1.

42. Under the LP Agreement, Hanlon agreed to refrain from engaging in any Prohibited Activity within the United States during the period of his employment with Barton and for one year thereafter. *See* Ex. B, § 13.2.1.

43. The LP Agreement defines Prohibited Activity as follows:

> "Prohibited Activity" is activity in which a Management Partner contributes their knowledge, directly or indirectly, in whole or in part—as an employee, employer, owner, operator, manager, advisor, consultant, agent, employee, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity—to an entity engaged in the same or similar business as the Consolidated Entities, including those engaged in the business of locum tenens staffing and recruiting, nurse staffing and recruiting, and allied health staffing and recruiting, in any role: (i) that is similar to any position such Management Partner held with the Consolidated Entities during the two (2) years preceding the termination of such Management Partner's employment, or (ii) that may require or inevitably require such Management Partner's disclosure of trade secrets, proprietary information, or other Confidential Information.

*See* Ex. B, p 9, Definition of "Prohibited Activity."

44. Under the LP Agreement, Hanlon agreed to refrain from directly or indirectly soliciting, hiring, recruiting, or inducing the termination of employment of any employee of the Consolidated Entities during the period of his employment with Barton and for one year thereafter. *See* Ex. B, § 13.3.

45. Under the LP Agreement, Hanlon agreed to refrain from directly or indirectly soliciting, contacting, or meet with any of the Consolidated Entities' current, former, or prospective customers or clients for purposes of offering or accepting goods or services similar to

or competitive with those offered by the Consolidated Entities, during the period of his employment with Barton and for one year thereafter. *See* Ex. B, § 13.4.[3]

**Hanlon's Post-Employment Restrictive Covenant Breaches**

46. Hanlon accepted employment with NurseStar shortly after Barton terminated his employment.

47. On information and belief, Hanlon is responsible for managing all of NurseStar's client accounts for the placement of temporary nurses and other allied professionals at healthcare facilities around the country. On information and belief, Hanlon also provides services to DocStar through his employment with NurseStar.

48. Hanlon's employment with NurseStar and relationship with DocStar constitute breaches of his contractual obligations and restrictive covenants owed under the Barton Agreement and the LP Agreement.

49. NurseStar provides services that directly compete with BHS, and DocStar provides services that directly compete with Barton, and, on information and belief, NurseStar and DocStar have built their affiliated business model in large part through their hiring of former Barton and BHS employees.

50. On information and belief, NurseStar and DocStar are so inter-related that Hanlon's employment with NurseStar provides a material benefit to DocStar to the material detriment of Barton. Hanlon's work for NurseStar aids, assists, and abets NurseStar and DocStar, and the (joint) management of each entity, in directly and indirectly competing with Barton and BHS.

---

[3] The LP Agreement also contains a non-disparagement clause prohibiting Hanlon from making, publishing or communicating "to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the Consolidated Entities or their businesses, or any of their employees, officers, directors, affiliates, and existing and prospective customers, recruiters, clients, investors, and other associated third parties." *See* Ex. B, § 13.5.

11

51. NurseStar and DocStar are both Florida Limited Liability Companies. According to their respective 2024 Florida LLC Annual Reports, they share the same principal place of business, the same mailing address, the same registered agent address, and the same "Authorized Persons." *Compare* **Exhibit F** (DocStar 2024 Florida LLC Annual Report), *with* **Exhibit G** (NurseStar 2024 Florida LLC Annual Report).

52. On information and belief, NurseStar and DocStar are owned and operated by the same four individuals: Nicholas Purvis; Albert Paul Gagne; Keith Gershman; and Jared Corra. Purvis' LinkedIn profile identifies him as Co-Founder of NurseStar, and President and Managing Member of DocStar; Gagne's LinkedIn profile identifies him as Co-Founder of NurseStar, and Co-Founder and Chief Operating Officer of DocStar; Gershman's LinkedIn profile identifies him as Co-Founder of NurseStar, and Co-Founder and CFO of DocStar; Corra's LinkedIn profile identifies him as Co-Founder of NurseStar and a Partner of DocStar.

53. On information and belief, Hanlon is long-time friends with Nicholas Purvis, Albert Paul Gagne, Keith Gershman, and/or Jared Corra.

54. NurseStar and DocStar recently announced they "are opening a new, joint headquarters" in Cedar Park — a suburb of Austin, Texas. *See* Exhibit H. The Texas Department of Licensing and Regulation lists the Project Name as "DocStar & NurseStar Medical Partners." *See* Exhibit I.

55. On information and belief, NurseStar and DocStar conspired with Hanlon to "house" Hanlon as a NurseStar employee, rather than a DocStar employee, in a deliberate attempt to circumvent Hanlon's contractual obligations and restrictive covenants under the Barton Agreement for the purpose of gaining access to Plaintiffs' proprietary, confidential and trade secret information and Plaintiffs' Clients.

12

## COUNT I
## Breach of the Barton Agreement
### (Section 3(a), Non-Competition)

56. Plaintiffs incorporate by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

57. The Barton Agreement is a valid and enforceable contract that Hanlon entered into in exchange for good and valuable consideration, and Barton has fully performed every material obligation under the Barton Agreement.

58. The restrictions of Section 3(a) of the Barton Agreement are not more extensive than is reasonably necessary for the protection of Plaintiffs' legitimate business interests.

59. Hanlon's employment with NurseStar and relationship with DocStar constitute breaches and violations of his promises and covenants under Section 3(a) of the Barton Agreement.

60. Plaintiffs have been harmed by Hanlon' breaches of Section 3(a) of the Barton Agreement, and stand to suffer irreparable harm by his continued breaches thereof.

## COUNT II
## Breach of the Barton Agreement
### (Section 2(b), Confidential Information)

61. Plaintiffs incorporate by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

62. The Barton Agreement is a valid and enforceable contract that Hanlon entered into in exchange for good and valuable consideration, and Barton has fully performed every material obligation under the Barton Agreement.

63. The restrictions of Section 2(b) of the Barton Agreement are not more extensive than is reasonably necessary for the protection of Plaintiffs' legitimate business interests.

64. On information and belief, Hanlon has breached, and will continue to breach, Section 2(b) of the Barton Agreement by misappropriating Plaintiffs' proprietary, confidential and

trade secret information and using and disclosing use information to compete against Plaintiffs on behalf of NurseStar and DocStar.

65. On information and belief, Hanlon has inevitably disclosed, and will continue to inevitably disclose, Plaintiffs' proprietary, confidential and trade secret information to DocStar and NurseStar, and other third parties.

66. Plaintiffs have been harmed by Hanlon' breaches of Section 2(b) of the Barton Agreement, and stand to suffer irreparable harm by his continued breaches thereof.

## COUNT III
### Breach of the Barton Agreement
### (Section 3(c), Customer Non-Solicitation Covenant)

67. Plaintiffs incorporate by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

68. The Barton Agreement is a valid and enforceable contract that Hanlon entered into in exchange for good and valuable consideration, and Barton has fully performed every material obligation under the Barton Agreement.

69. The restrictions of Section 3(c) of the Barton Agreement are not more extensive than is reasonably necessary for the protection of Plaintiffs' legitimate business interests.

70. On information and belief, Hanlon has breached, and will continue to breach, Section 3(c) of the Barton Agreement by soliciting and/or engaging in business with Plaintiffs' Clients on behalf of NurseStar and DocStar.

71. Plaintiffs have been harmed by Hanlon' breaches of Section 3(c) of the Barton Agreement, and stand to suffer irreparable harm by his continued breaches thereof.

## COUNT IV
### Breach of the LP Agreement
### (Section 13.2, Non-Competition)

72. Plaintiffs incorporate by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

73. The LP Agreement is a valid and enforceable contract to which Hanlon became a party in exchange for good and valuable consideration, and the Limited Partnership has fully performed every material obligation it owes Hanlon under the LP Agreement.

74. The restrictions of Section 13.2 of the LP Agreement are not more extensive than is reasonably necessary for the protection of the Limited Partnership's and Plaintiffs' legitimate business interests.

75. Hanlon's employment with NurseStar and relationship with DocStar constitute breaches and violations of his promises and covenants under Section 13.2 of the LP Agreement.

76. Plaintiffs have been harmed by Hanlon' breaches of Section 13.2 of the LP Agreement, and stand to suffer irreparable harm by his continued breaches thereof.

## COUNT V
### Breach of the LP Agreement
### (Section 13.1, Confidentiality)

77. Plaintiffs incorporate by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

78. The LP Agreement is a valid and enforceable contract to which Hanlon became a party in exchange for good and valuable consideration, and the Limited Partnership has fully performed every material obligation it owes Hanlon under the LP Agreement.

79. The restrictions of Section 13.1 of the LP Agreement are not more extensive than is reasonably necessary for the protection of the Limited Partnership's and Plaintiffs' legitimate business interests.

80. On information and belief, Hanlon has breached, and will continue to breach, Section 13.1 of the LP Agreement by using and disclosing Plaintiffs' proprietary, confidential and trade secret information to compete against Plaintiffs on behalf of NurseStar and DocStar.

81. On information and belief, Hanlon has inevitably disclosed, and will continue to inevitably disclose, Plaintiffs' proprietary, confidential and trade secret information to DocStar and NurseStar, and other third parties.

82. Plaintiffs have been harmed by Hanlon' breaches of Section 13.1 of the LP Agreement, and stand to suffer irreparable harm by his continued breaches thereof.

## COUNT VI
### Breach of the LP Agreement
### (Section 13.4, Non-Solicitation Covenant)

83. Plaintiffs incorporate by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

84. The LP Agreement is a valid and enforceable contract to which Hanlon became a party in exchange for good and valuable consideration, and the Limited Partnership has fully performed every material obligation it owes Hanlon under the LP Agreement.

85. The restrictions of Section 13.4 of the LP Agreement are not more extensive than is reasonably necessary for the protection of Plaintiffs' legitimate business interests.

86. On information and belief, Hanlon has breached, and will continue to breach, Section 13.4 of the LP Agreement by soliciting and/or engaging in business with Plaintiffs' Clients on behalf of NurseStar and DocStar.

87. Plaintiffs have been harmed by Hanlon' breaches of Section 13.4 of the LP Agreement, and stand to suffer irreparable harm by his continued breaches thereof.

## JURY TRIAL DEMAND

Plaintiffs hereby requests a trial by jury on all claims properly triable to a jury.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief for Plaintiffs and against Hanlon:

1. Enjoining Hanlon from further breaches and violations of the Barton Agreement and the LP Agreement;

2. Enjoining Hanlon from providing any services in violation of the Barton Agreement and the LP Agreement, whether on behalf of NurseStar and DocStar or any other person or entity;

3. Enjoining Hanlon from soliciting or providing any services to any of Plaintiffs' customers in violation of the Barton Agreement and the LP Agreement, whether on behalf of NurseStar and DocStar or any other person or entity;

4. Tolling of all applicable restricted periods contained in the Barton Agreement and the LP Agreement until all of Hanlon's breaches and violations have been cured, pursuant to Section 15 of the Barton Agreement and Section 13.6 of the LP Agreement;

5. Compensatory damages in an amount to be determined at trial, but in any event exceeding $75,000.00;

6. Awarding Plaintiffs their costs and expenses, including attorneys' fees and costs, pursuant to Section 8 of the Barton Agreement and Section 13.6 of the LP Agreement; and

7. Granting Plaintiffs such other relief as the Court deems just and proper.

|  |  |
|---|---|
| Justin K. Victor (#5705)<br>GREENBERG TRAURIG, LLP<br>3333 Piedmont Road NE, Suite 2500<br>Atlanta, GA 30305<br>(678) 553-2100<br>victorj@gtlaw.com<br><br>Nicholas D. SanFilippo<br>GREENBERG TRAURIG, LLP<br>1750 Tysons Blvd., Suite 1000<br>McLean, VA 22102<br>(703) 903-7507<br>Nicholas.sanfilippo@gtlaw.com<br><br>Dated:  June 24, 2024 | Respectfully submitted,<br><br>/s/ Samuel L. Moultrie<br>Samuel L. Moultrie (#5979)<br>GREENBERG TRAURIG, LLP<br>222 Delaware Avenue, Suite 1600<br>Wilmington, DE 19801<br>(302) 661-7000<br>moultries@gtlaw.com<br><br>*Counsel for Plaintiffs Barton & Associates, Inc. and Barton Healthcare Staffing, LLC* |